# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| **JOHN KEATLEY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 3:21-cv-00230** |
| ) | **Judge Aleta A. Trauger** |
| **THE ESCAPE GAME, LLC,** ) | |
| ) | |
| **Defendant/Third Party Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **CINCO DESIGN OFFICE, INC.,** ) | |
| ) | |
| **Third Party Defendant.** ) | |

## MEMORANDUM and ORDER

Before the court is plaintiff John Keatley's Motion for Attorney's Fees and Costs (Doc. No. 42), seeking total fees and costs in the amount of $26,008.99. For the reasons set forth herein, the motion will be denied, insofar as it seeks to shift attorney's fees, and granted in part with respect to the recovery of costs.

## I.    PROCEDURAL BACKGROUND

John Keatley is an "acclaimed and award-winning photographer" based in Seattle, Washington. (Doc. No. 20 ¶ 2.) The Escape Game, LLC ("TEG") is a Nashville-based "business that provides an entertainment service for customers where they follow clues and solve puzzles to escape from a locked room, whether in person or online" and has numerous locations across the country, including in Nashville. (*Id.* ¶ 3.) Keatley filed suit against TEG in this court in March 2021, asserting a single claim of copyright infringement, based on TEG's use, in its marketing

materials, of three photographs (the "Works") that Keatley created and registered with the Register of Copyrights, as a result of which Keatley "owns valid copyrights in the Works." (Doc. No. 1 ¶ 26.) TEG filed an Answer (Doc. No. 9) as well as a Third-Party Complaint (Doc. No. 13) against Cinco Design Office, Inc. ("Cinco"), a marketing company TEG had engaged to help it strengthen its brand and from which TEG had obtained the Works.

On May 25, 2021, Keatley filed an Amended Complaint. (Doc. No. 20.) In this pleading, in addition to a copyright infringement claim, Keatley asserts that TEG altered or removed copyright management information ("CMI") (specifically, metadata attached to the digitally transmitted photographs) when publishing the Works, in violation of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202. The Amended Complaint seeks a permanent injunction as well as the "actual damages and TEG's profits attributable to the [copyright] infringement, or, at Plaintiff's election, statutory damages of up to $150,000 per work infringed, as provided in 17 U.S.C. § 504," and the "actual damages" attributable to the removal or alteration of CMI or, at [his] election, statutory damages of up to $25,000 per violation, as authorized by 17 U.S.C. § 1203(c)(3)(B), plus attorney's fees and costs. (Doc. No. 20, at 9.) In other words, the Amended Complaint sought damages in an amount up to $525,000.

On October 7, 2021, Keatley filed a Notice of Acceptance of Offer of Judgment (Doc. No. 40) and a copy of the accepted Offer (Doc. No. 40-1). In the Offer of Judgment, TEG offered to allow judgment to be entered against it for money damages in the amount of $24,000 and a permanent injunction prohibiting it from using the Works in any fashion without Keatley's express written consent. The Offer of Judgment expressly excluded the plaintiff's costs and attorney's fees, which the defendant reserved the right to oppose. (Doc. No. 40-1, at 2.) Judgment was entered for Keatley on October 12, 2021 (Doc. No. 41), in accordance with the terms of the Offer of Judgment,

Pursuant to TEG's Stipulation, the Third-Party Complaint was dismissed with prejudice. (Doc. No. 46.)

Keatley filed his Motion for Attorney's Fees and Costs, along with a supporting Memorandum, the Declarations of two attorneys (Evan Andersen and Joel Rothman), a Costs Invoice, and several exhibits. (Doc. Nos. 42, 43, 43-1 through 43-3.) TEG filed its Response in opposition to the fee motion, along with the Declaration of its attorney, Joshua Arters, and attached exhibits. (Doc. Nos. 44, 44-1.) Keatley, through Andersen, filed a Reply and a second Declaration, with more exhibits. (Doc. Nos. 45, 45-1.)

## II.   FACTUAL BACKGROUND AND SETTLEMENT EFFORTS

As noted above, the Memorandum in support of the Motion for Attorney's Fees is supported by the Declaration of Evan A. Andersen. Attached as exhibits to his Declaration are: (1) "The Escape Game Brand Refresh SOW [Statement of Work]" dated March 20, 2018, forwarded to Keatley by Cinco on March 10, 2021 (SOW, Doc. No. 43-1, at 13–21); (2) an email chain forwarded to Andersen by Joshua Arters, counsel for TEG, on June 30, 2021, which Arters represented to be "the original email file Cinco sent to TEG back in 2018 that included the photos in question" (Andersen Decl., Doc. No. 43-1 ¶ 11; *see also* Doc. No. 43-1, at 23–26); (3) a redacted email string consisting of communications between TEG and Cinco on May 16 and 17, 2019 (Doc. No. 43-1, at 28–32); (4) a redacted email chain received by counsel for Keatley on July 8, 2019 from an agent for the American Egg Board, consisting of communications between the agent and TEG (Doc. No. 43-1, at 34–35); and (5) a copy of a letter dated September 13, 2019, from ImageRights International, Inc. on behalf of Keatley to TEG, notifying TEG of the unauthorized display of the Photographs (Doc. No. 43-1, at 37–38).

The SOW is the contract for rebranding services between TEG and Cinco, dated March 7, 2018. As relevant here, the contract provided a "list of general and specific project assumptions

and dependencies" taken into account by the project pricing, including that "TEG will provide any existing image assets that support the brand identity," and, "[i]f additional licensed imagery is needed, TEG will purchase directly." (Doc. No. 43-1, at 16.) On the list of "Client Tasks" assigned to TEG by the SOW was the responsibility to "[p]rovide imagery and assets not developed by Cinco Design." (*Id.*)

In an email exchange between Teddy Cheek for TEG and a Cinco representative that took place in early July 2018, Cheek asked, "Do you have the stock images from the Messaging Guide? Cousin Phoebe, Grandpa Ron, etc.? I'm using them in a presentation." (Doc. No. 43-1, at 25.) Cinco's response was, "You betcha! Stand by." (*Id.*) Shortly thereafter, the same Cinco representative emailed copies of the three Works at issue, without further explanation or qualification. (*Id.* at 23–24.)

Almost a year later, on May 16, 2019, another Cinco representative emailed Cheek to provide notice that TEG was using photographs on its website for which Cinco had not secured licenses:

> We noticed that on your website, some of the reference imagery that was included in one of our messaging decks is featured on one of [TEG's website's] subpages. [Link omitted.] It looks amazing, but we wanted to give you a heads up that those images from that deck were not licensed with the photographer as they were used only to demonstrate our intent for internal purposes . . . . If TEG has negotiated usage with the photographer directly, that's great! But in the event usage has not been secured between TEG and the photographer, we did want to provide you with this info to help you avoid any potential legal challenges.

(Doc. No. 43-1, at 30.) Cheek responded: "Thanks for the heads up! We didn't realize. We'll handle that." (*Id.*)

TEG apparently attempted to handle it but did not succeed in locating each image that was posted on the internet. On July 8, 2019, an agent with Energy BBDO sent an email to TEG on behalf of its client, the American Egg Board, stating:

It was brought to our attention that one of the images that you are using in your advertising is a photograph that we contracted with photographer John Keatley to shoot for our client . . . . How did you get this image? And can you please take this image down as it is exclusively licensed for use by our client.

(Doc. No. 43-1, at 34.) TEG responded that it would "take that photo down immediately" and that the images had been "passed along" to TEG during "concept talks" by the marketing firm with which it had done a rebrand earlier that year. (*Id.*)

On September 13, 2019, a lawyer with ImageRights International, Inc. ("ImageRights") wrote TEG on behalf of Keatley, stating that it had been engaged by Keatley to "assist in identifying unauthorized uses of his images" and had discovered TEG's unauthorized use of the Works (copies of which were incorporated into the letter) on its website, for which the letter included a link. This letter demanded that TEG cease and desist such unauthorized use and that it immediately remit $60,000 "in exchange for a retroactive license covering the usage to date." (Doc. No. 43-1, at 37–38.)

In support of its opposition to the Motion for Attorney's Fees, TEG filed the Declaration of its attorney, Joshua Arters. With Keatley's Reply, Andersen submitted a second Declaration, to which he attached as an exhibit the email chain embodying settlement discussions between him and TEG's attorneys from July 2021 through October 2021, all of which are referenced in Arters' Declaration. (Doc. No. 45-1.) In his Declaration, Arters attests first that, after receiving the demand letter from ImageRights in September 2019 "informing TEG that [the Works] appeared on a year-old blog post, TEG immediately removed these photos and offered Keatley $600." (Doc. No. 44-1 ¶ 3.) Keatley did not accept the offer, and TEG did not receive any further demands from ImageRights. (*Id.* ¶ 4.)

Almost a year later, in July 2020, TEG received another demand letter, this time from Daniel Novick of SRIPLAW[1] on behalf of Keatley. According to Arters, counsel for TEG responded and attempted to schedule time to negotiate in November 2020. (*Id.* ¶¶ 5–6.) In February 2021, Novick again contacted TEG, asking for TEG's contract with Cinco, correspondence with Cinco, and information about TEG's insurance policies. (*Id.* ¶ 7.) Arters states that, at that time, TEG "maintained its offer of $600, as it had not received any evidence regarding the value of the license to these photos and it had no reason to believe that Cinco did not license or develop the subject photos when it used them." (*Id.* ¶ 8.)

Keatley, obviously not satisfied with that offer, filed this lawsuit in March 2021. On April 16, 2021, TEG submitted to Keatley its first Offer of Judgment in the amount of $6,500, inclusive of attorney's fees and injunctive relief prohibiting TEG from using Keatley's photos without Keatley's consent. (Doc. No. 44-1, at 9–12.) Keatley rejected TEG's First Offer of Judgment. (Doc. No. 44-1 ¶ 11.)

Arters states that, after Keatley's Amended Complaint was filed in May 2021, he "investigated the allegation that TEG altered copyright management information and concluded that the metadata embedded within the original .jpg files Cinco sent to TEG did not include any reference to Keatley in the 'Copyright Notice' field." (*Id.* ¶ 14.) Instead, it included information related to the make and model of the camera used to take the photographs. Arters, believing "there

---

[1] Keatley is represented by three attorneys in this matter. The lawsuit was filed by Daniel Novick of the SPRIPLAW firm, based in Nashville. The Amended Complaint was filed by attorney Joel Rothman, also of SRIPLAW, based in Boca Raton, Florida. Shortly after the filing of the Amended Complaint, attorney Evan Andersen, of Evan Andersen Law, LLC, based in Atlanta, Georgia, entered an appearance and an application to appear *pro hac vice*. In his second Declaration, Andersen explained that, even though he practiced under his own law firm's name, for the past year, he "worked as an attorney of counsel to SRIPLAW, P.A., a firm focused on intellectual property matters, and owned by Joel Rothman." (Doc. No. 45-1, Andersen 2d Decl. ¶ 4.)

was no basis for Keatley's claim for removal or alteration of copyright management information," provided to Keatley's counsel, Andersen, "the actual .jpg files TEG received and suggested [that the] parties discuss a settlement." (*Id.* ¶ 15.) In response, Anderson informed Arters that he had analyzed the .jpg files as well and confirmed that "Mr. Keatley's name does appear in the metadata of two of the three files. While it is not in the 'Copyright' [field], the name as appearing in the file's metadata could have provided a link to any potential end-user as to the author of the image, making it copyright management information under [17] USC 1202(c)(2)." (*Id.* ¶ 16.) Arters states that he investigated further and "determined that Keatley's name was buried within hundreds of lines of metadata in two of the three .jpg files, making it highly improbable that such metadata would qualify as 'copyright management information' under 17 U.S.C. § 1202(c)(2)." (*Id.* ¶ 17.)

Nonetheless, after this conversation, Keatley demanded $150,000 to settle, based on "the fact that he was allegedly paid 'approximately $365,000' to shoot 14 photographs for the American Egg Board (including the photos at issue), and [that] 'the overall cost to create and license these images [was] very high.'" (*Id.* ¶ 18.) According to Arters, Andersen also represented that the settlement demand was based on:

> (1) the fact that the license Keatley provided to American Egg Board was "an exclusive license . . . and has created professional issues for [Keatley] as The Escape Game used these exclusively licensed images for its own commercial purposes, diluting the value of the images for the American Egg Board"; (2) the assumption that TEG "receive[s] tens of millions of dollars of revenue each year"; and (3) the assertion that TEG acted willfully.

(*Id.* ¶ 19.) In the same email, Andersen explained his client's view of the evidence supporting willful infringement. He wrote:

> [T]he documents you sent to me showed that your client asked to use the Photographs for "a presentation." While even this use would not be allowed under the licenses granted by my client to the Photographs, TEG's commercial use of the Photographs was with actual knowledge that it was beyond any use granted to it for use. This entitles my client to recover enhanced statutory damages for the willful infringement of the Photographs.

(Doc. No. 45-1, at 29.)

TEG rejected Keatley's demand and served a second Offer of Judgment on July 23, 2021, this time offering to allow judgment against it for $18,000, exclusive of costs and attorney's fees, but including injunctive relief prohibiting TEG from using the Works without Keatley's consent. (Doc. No. 44-1, at 14–17.) This Offer stipulated that the defendant reserved the right to oppose any motion for attorney's fees. In addition, based on Keatley's having represented that he had granted the American Egg Board an exclusive license to the Works, the Offer of Judgment would have imposed on Keatley an indemnity obligation that would be triggered if any third party, including the American Egg Board, sued TEG "on or for any claims arising out of or related to the alleged copyright 'Works.'" (*Id.* at 14.) In the email accompanying the second Offer of Judgment, counsel for TEG also disputed the existence of any evidence of willfulness, insisting that "TEG reasonably and in good faith believed that the three images [it received from Cinco] were 'stock' photos (for which payment to Cinco was made)." (Doc. No. 45-1, at 27.) He also maintained that there was no evidence of intentional removal of metadata identifying copyright information, because "[c]ase law is clear that our client will not be charged with knowledge of something it did not know and could not discover with the use of basic tools." (*Id.*)

Andersen responded that the American Egg Board did not have an exclusive license to the Works after all. Instead, its license allowed Keatley to "maintain[] copyright" and permitted him to use the photos "for self-promotion only." (Doc. No. 44-1 ¶ 22.) He also insisted that the evidence supported willfulness, because "TEG could have easily asked for additional information or authorization, but instead made a bad assumption and proceeded without meeting its due diligence burden for obtaining property permissions to do so. (Doc. No. 45-1, at 26.) Regarding the metadata, Andersen disputed TEG's counsel's characterization of it as inaccessible and noted that, "in

copyright law, willful blindness counts as actual knowledge." (*Id.*) The email included a settlement demand of $120,000. (*Id.*) The settlement figure was also premised in part upon Keatley's continued claims that he could be awarded the production costs incurred to originally shoot the photographs as part of his actual damages. (*Id.* at 25.)

In response, Arters requested that Keatley provide information regarding comparable licenses granted to others for use of his photographs to support his request for damages. Andersen provided three purportedly similar licenses. According to Arters, these licenses "included a whole host of other costs beyond the actual license, like 'creative fees,' airline baggage fees, airport transportation, international phone plan fees, and hotel laundry services." (Doc. No. 44-1 ¶ 25.) In August 2021, after additional requests for information, Keatley "finally provided a spreadsheet he represented as his 'commercial and corporate licensing history.'" (*Id.* ¶ 26.)

Arters states that his analysis of the spreadsheet revealed that, despite variations in the terms of the licenses, "over 80% of the entries indicated Keatley was paid an amount equal to or less than" the $18,000 TEG had offered in its second Offer of Judgment. (*Id.* ¶ 28.) In fact, according to Arters,

> When counsel for TEG considered the amount of an 11-month non-exclusive commercial license for three photos (the license Keatley admitted is at issue in this case), counsel for TEG determined that Keatley would have been paid only a fraction of the amount offered in the Second Offer of Judgment.

(*Id.* ¶ 29; *see also* Doc. No. 45-1, at 17.) In the lengthy email responding to Andersen's demand, Arters, on behalf of TEG, rejected the $120,000 settlement demand, explained in detail his analysis of the licensing information Keatley had finally provided, explained again why TEG did not believe the evidence supported claims of willful infringement or a DMCA violation, expressed doubt as to whether Keatley would be entitled to attorney's fees based on the history of the case, and reiterated TEG's prior $18,000 offer, exclusive of attorney's fees, which Arters maintained

would "outpace any recovery to which your client is entitled." (Doc. No. 45-1, at 17.) Arters concluded: "At this point, I think it makes sense for us to try to get on the same page and present a number to both of our clients to move on and end this matter." (*Id.*)

Counsel for Keatley responded with his own lengthy email. (*Id.* at 12–14.) He disputed some of Arters' calculations, insisting that Keatley's statutory damages would likely exceed the amount of a "lost license" because a finding of willful infringement was "still likely," making TEG liable for up to $150,000 per photograph. (*Id.* at 13–14.)

After further back and forth, Keatley proposed reducing his settlement demand to $90,000 if TEG increased its settlement offer to $40,000. (Doc. No. 44-1 ¶ 32.) TEG rejected this proposal and submitted its third Offer of Judgment in the amount of $24,000 on September 23, 2021. In the email accompanying the Offer of Judgment, counsel reiterated his belief that the $18,000 offer "should have resolved the matter" and stated:

> In the offer, we have expressly reserved the right to oppose any request for attorney's fees. That is because $24,000 is more than sufficient to cover Keatley's damages, any deterrence, costs, and reasonable attorney's fees where, as here, the fair market value for a non-exclusive license for each image is around $1,500 per year. This is particularly true in light of the fact that Keatley did not have the right to commercialize the images until after his contract with [the American Egg Board] expired. We agree that Keatley is still the copyright holder with standing, as you have represented, but this is essentially 'found money' for Keatley because he would have otherwise been prohibited from licensing the images to TEG under the terms of his contract with [the American Egg Board].

(Doc. No. 45-1, at 6.)

Keatley accepted TEG's third Offer of Judgment. (*Id.* at 4.)

## III.    LEGAL STANDARDS

### A.    Attorney's Fees

The Copyright Act of 1976 grants district courts discretion to award costs and attorney's fees in copyright infringement actions, as follows:

> In any civil action under this title, the court *in its discretion may allow* the recovery of full costs by or against any party other than the United States or an officer thereof. Except as otherwise provided by this title, the court *may also award* a reasonable attorney's fee to the prevailing party as part of the costs.

17 U.S.C. § 505 (emphasis added).

The Supreme Court has recognized that the statute gives "broad leeway . . . to district courts," "without specifying standards that courts should adopt, or guideposts they should use, in determining when such awards are appropriate." *Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197, 202 (2016). In *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994), the Court "established several principles and criteria to guide" district courts' decisions under § 505, specifically that (1) courts may not "award[] attorney's fees as a matter of course" but must instead decide each matter on a case-by-case basis to determine whether an award is warranted under the particular circumstances presented; and (2) courts must not treat prevailing plaintiffs and prevailing defendants differently. *Id.* at 533, 527. The Court also approved "several nonexclusive factors" the district courts should consider in deciding whether to award fees, including "frivolousness, motivation, objective unreasonableness[,] and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 534 n.19.

In *Fogerty*, the Court expressly left open the possibility that further guidance might be necessary. *Id.* at 534–35. In *Kirtsaeng*, the Court reiterated the factors first announced in *Fogerty* and also held that courts should give "substantial weight to the objective (un)reasonableness of the losing party's litigation position," because such an approach would have the desired effect of both "encourag[ing] parties with strong legal positions to stand on their rights and deter[ring] those with weak ones from proceeding with litigation." 579 U.S. at 205. Ultimately, however, when deciding whether to award attorney's fees under § 505, "courts must view all the circumstances of a case on their own terms, in light of the Copyright Act's essential goals." *Id.* at 209. No one factor is

controlling, and district courts continue to retain discretion to "take into account a range of considerations[.]" *Kirtsaeng*, 579 U.S. at 208.

### B. Costs

Regarding costs, the Supreme Court has held that the "full costs" that may be shifted under the Copyright Act are only those that fall within "the six categories specified in the general costs statute, codified at [28 U.S.C.] §§ 1821 and 1920." *Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 876 (2019). Section 1821 addresses payment of lay witnesses' costs and expenses, 28 U.S.C. § 1821, and is not relevant here. *See Sales v. Marshall*, 873 F.2d 115, 119 (6th Cir. 1989) ("An examination of § 1821 in its entirety shows clearly that it provides for the payment of certain fees and allowances to witnesses, not to parties."). Section 1920 provides for the taxation of the following six categories of costs:

> (1) Fees of the clerk and marshal;
>
> (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
>
> (3) Fees and disbursements for printing and witnesses;
>
> (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
>
> (5) Docket fees under section 1923 of this title;
>
> (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

28 U.S.C. § 1920. A party seeking payment under § 1920 generally must file an itemized bill of costs. *Id.*

In addition to § 505, Rule 54(d) provides that, "[u]nless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." The Sixth Circuit has held that this rule "creates a presumption in favor of

awarding costs, but allows denial of costs at the discretion of the trial court." *White & White, Inc. v. American Hosp. Supply Corp.*, 786 F.2d 728, 730 (6th Cir. 1986).

## IV.    DISCUSSION

### A.    Attorney's Fees

Keatley argues that he is the prevailing party in this litigation and that the factors identified by the Supreme Court in *Fogerty* and *Kirtsaeng* weigh in favor of awarding him reasonable attorney's fees. More specifically, he asserts that he prevailed on all of his claims and settled for more than nominal damages, that his claims were not frivolous, that it was not unreasonable for him to file suit and continue with litigation "while TEG's offers to settle remained lower than what he expected to recover" (Doc. No. 43, at 8), and that TEG's pre-litigation and early litigation position was objectively unreasonable. He also maintains that TEG's motivation in using Keatley's Works without a license—its own financial benefit—supports an award of fees, as its use of the Works "did not enhance or further the goals of the Copyright Act." (*Id.* at 10.) He states that "deterrence is needed against TEG and other potential infringers to protect against this kind of willful inaction to determine licensing rights in the future." (*Id.*) Finally, he argues that an award of attorney's fees in this type of case is necessary to "encourage[] and reward[] authors' creations by providing copyright owners with the ability to defend their rights without fear of the need to pay for an attorney's time, especially when the defenses raised by the opposing side are objectively unreasonable." (*Id.* at 11 (citing *Fogerty*, 510 U.S. at 529).)

For its part, TEG insists that "Keatley's request for over $26,000 in attorneys' fees (for three different lawyers from two different law firms and their staff) in a case where he sought $525,000 in damages and accepted a $24,000 Offer of Judgment is patently unreasonable and should be denied outright." (Doc. No. 44, at 1.) While acknowledging that Keatley is technically the prevailing party, TEG contends that the difference between the valuation of the claims in the

Amended Complaint and the substantially lower figure Keatley accepted in settlement establishes that this was simply a "nuisance-value settlement." (*Id.* at 2.) TEG contends, on this basis, that the court has the authority to deny attorney's fees altogether. TEG also argues that the *Fogerty* factors weigh in its favor: (1) while Keatley's copyright infringement claims themselves were not actually frivolous, his claims of willfulness and violation of the DMCA were objectively unreasonable and thus "essentially frivolous"; (2) the facts demonstrate that Keatley's motivation in maintaining his lawsuit, despite the lack of evidence to support his claims, was to force TEG to increase its settlement offer; (3) TEG's legal position was objectively reasonable, while Keatley's insistence that TEG willfully infringed his copyright and altered or removed CMI was objectively unreasonable; and (4) where a party has "advanced a reasonable, yet unsuccessful position, an award of attorney fees to the prevailing party generally does not promote the purposes of the Copyright Act." (Doc. No. 44, at 21 (quoting *Bridgeport Music, Inc. v. Diamond Time, Ltd.*, 371 F.3d 883, 895 (6th Cir. 2004)).)

The court is persuaded by the defendant's arguments. Based on the entirety of the circumstances presented here, the court finds that an award of attorney's fees to Keatley is not warranted, despite his technical status as the prevailing party in this litigation. First, the $24,000 settlement figure constitutes approximately 4.6% of the initial demand of $525,000, and Keatley accepted the $24,000 Offer of Judgment, despite knowing that the issue of attorney's fees would be contested. The settlement amount can reasonably be "understood as [a] nuisance-value" settlement. *Fletcher v. City of Fort Wayne*, 162 F.3d 975, 976 (7th Cir. 1998); *see id.* (noting that the trial court's conclusion that the settlements were for "nuisance" value was bolstered by one plaintiff's settlement for 3.3% of his demand and the other's settlement for 8.3% of his demand).

In addition, the documentary evidence produced by Keatley effectively establishes that TEG's legal position was objectively reasonable while Keatley's continued insistence on damages of well over $100,000 (even after abandoning the amount sought in the Amended Complaint) was objectively unreasonable. While there has been no trial of the issues and the court is not in a position to resolve contested issues of fact, the undisputed facts in the record do not remotely appear to establish willful infringement or intentional violation of the DMCA. For infringement to be willful, "it must be done with knowledge that [one's] conduct constitutes copyright infringement." *Zomba Enters., Inc. v. Panorama Records, Inc.*, 491 F.3d 574, 584 (6th Cir. 2007) (internal citations and quotation marks omitted). Likewise, for liability under the DCMA to attach, the plaintiff would have to prove that TEG "possessed actual knowledge of the unauthorized change to the copyright management information, because the statute requires the defendant to act 'knowing that copyright management information [had] been removed or altered without authority of the copyright owner or the law." *Gordon v. Nextel Commc'ns & Mullen Advert., Inc.*, 345 F.3d 922, 926 (6th Cir. 2003) (quoting 17 U.S.C. § 1202(b)(3)).

Considerations of compensation and deterrence do not weigh in Keatley's favor either, as it appears that the settlement amount has more than reasonably compensated him for damages arising from the infringement—whether actual or statutory—and there is no indication that TEG has a history of copyright infringement or intends to engage in any future copyright infringement. Finally, the court does not find that awarding fees to Keatley would further the Copyright Act's "essential goals." *Kirtsaeng*, 579 U.S. at 209. "When [the non-prevailing party] has advanced a reasonable, yet unsuccessful position, an award of attorney fees to the prevailing [party] generally [would] not promote the purposes of the Copyright Act." *Bridgeport Music, Inc. v. Diamond Time, Ltd.*, 371 F.3d 883, 895 (6th Cir. 2004). TEG, as the technically non-prevailing party, clearly

advanced reasonable positions. Moreover, it made repeated and reasonable settlement offers along the way, and the length of time involved and the amount of attorney's fees incurred before a settlement was ultimately consummated are largely attributable to the plaintiff's intransigence.

Keatley's motion, insofar as it requests an award of attorney's fees as part of his costs under 17 U.S.C. § 505, will be denied.

### B.     Costs

Keatley also seeks the recovery of costs, including the $150 *pro hac vice* fee, the $402 filing fee, and $6.99 for "Disbursement to courier for shipment of documents" on July 13, 2020, well before this lawsuit was filed. (Doc. No. 43-3.)

Although the defendant does not expressly object to any of these costs, the court notes that (1) the plaintiff did not actually submit a formal Bill of Costs; and (2) the plaintiff has not shown that the *pro hac vice* fee or payments to "couriers" for "shipment of documents" fall within the scope of § 1920.

Regarding the former, Section 1920 does not specifically authorize *pro hac vice* admission fees to be taxed as costs, and the courts of appeal are split on whether courts may appropriately tax such admission fees to the non-prevailing party. *Compare Kallitta Air LLC v. Central Tex. Airborne Sys., Inc.*, 741 F.3d 955, 957–58 (9th Cir. 2013) (per curiam) (not taxing *pro hac vice* fees), *with Craftsman Limousine, Inc. v. Ford Motor Co.*, 579 F.3d 894, 896 (8th Cir. 2009) (taxing *pro hac vice* fees).

The Sixth Circuit has not addressed whether *pro hac vice* fees are a taxable cost under § 1920, and the district courts within the Sixth Circuit are also split on this issue. The Western District of Kentucky generally awards such fees as part of recoverable costs. *See, e.g., Bailey v. United Recovery Sols., Inc.*, No. 3:17CV-00350-DJH-RSE, 2018 WL 6332849, at *4 (W.D. Ky. Oct. 23, 2018) ("Judges within this District have consistently concluded since 2010 that 'a *pro hac*

*vice* filing fee is a fee allowed under § 1920(1) and may be taxed as part of costs.'" (collecting cases)), *report and recommendation adopted*, No. 3:17-CV-350-DJH-RSE, 2018 WL 6330413 (W.D. Ky. Dec. 4, 2018). But other courts within the Sixth Circuit, including the Tennessee district courts, have declined to award them. *See, e.g.*, *Clay v. Berryhill*, No. 17-2586-DKV, 2019 WL 12711724, at *1 (W.D. Tenn. July 29, 2019) ("Although the Sixth Circuit has not addressed the issue of whether *pro hac vice* fees are recoverable costs, other districts within the Sixth Circuit have found that they are unrecoverable." (collecting cases)); *Huntsville Golf Dev., Inc. v. Brindley Const. Co.*, No. 1-08-00006, 2011 WL 4960421, at *4 (M.D. Tenn. Oct. 18, 2011) (Haynes, J.) ("Based on the weight of authority, the Court concludes that *pro hac vice* fees are an expense that an attorney pays for the privilege of practicing law in a district and unrecoverable under § 1920.").

This court is persuaded that *pro hac vice* fees are not recoverable as costs. As the Eastern District of Kentucky has explained:

> Because courts' authority to tax costs is circumscribed by § 1920, the power to tax *pro hac vice* fees must emanate from that provision. Section 1920, however, does not specifically authorize courts to tax costs for *pro hac vice* fees. [Section 1920(1)] permits the district court to tax the "[f]ees of the clerk and marshal." The fees of the clerk and marshal are delineated in 28 U.S.C. § 1914. Section 1914 includes a $350 filing fee and "such additional fees only as are prescribed by the Judicial Conference of the United States." 28 U.S.C. § 1914. The fees prescribed by the Judicial Conference do not mention *pro hac vice* fees. Instead, the Judicial Conference has permitted clerks to charge for full and permanent, not just temporary, admission to the bar of the court. Because § 1920, § 1914, and the fees from the Judicial Conference do not include *pro hac vice* fees, the Court does not have the power to tax those costs.

*Smith v. Joy Techs., Inc.*, No. CIV. 11-270-ART, 2015 WL 428115, at *5 (E.D. Ky. Feb. 2, 2015) (most internal quotation marks and citations omitted). The court also notes that in this district, when costs are taxed by the Clerk of Court pursuant to a Bill of Costs, the recovery of *pro hac vice* fees is not permitted.

Accordingly, the defendant not having objected to an award of costs, the court will grant costs to Keatley as the prevailing party, but only those costs allowed by statute. Accordingly, the court awards costs in the amount of $402, rather than the $558.99 sought by the plaintiff

## V.      CONCLUSION AND ORDER

For the reasons set forth herein, Keatley's Motion for Attorney's Fees and Costs (Doc. No. 42), seeking total fees and costs in the amount of $26,008.99 is **GRANTED IN PART AND DENIED IN PART**. The motion is **DENIED**, insofar as it seeks an award of attorney's fees, and **GRANTED IN PART** with respect to the recovery of costs. Keatley is **hereby awarded $402 in costs**.

It is so **ORDERED**.

_____
ALETA A. TRAUGER
United States District Judge